# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 6990 | **DATE** | March 29, 2002 |
| **CASE TITLE** | *American National Bank v. Alps Electric* | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The parties' cross-motions for summary judgment [50-1 and 54-1] are DENIED. Enter Memorandum and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | number of notices | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | | |
| | No notices required. | | | | | |
| ✓ | Notices mailed by judge's staff. | | | MAR 2 9 2002 | | 75 |
| | Notified counsel by telephone. | | | date docketed | | |
| | Docketing to mail notices. | | | | | |
| | Mail AO 450 form. | | | | | |
| ✓ | Copy to judge/magistrate judge. | | | | | |
| RTS | courtroom deputy's initials | | | date mailed notice | | |
| | | | | mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Plaintiff, | ) ) ) ) ) | |
| v. | ) ) | No. 99 C 6990 |
| ALPS ELECTRIC CO., LTD., NIT HOLDINGS LIMITED, MATHIAS BURLET, and DONALD WEST, Defendants. | ) ) ) ) | |

## MEMORANDUM AND ORDER

This is an action for interpleader filed by American National Bank ("ANB") pursuant to 28 U.S.C. § 1335. Plaintiff ANB has been dismissed from this action. Defendants Alps Electric Company ("Alps") and Mathias Burlet ("Burlet") are claimants to the interpleaded funds.[1] They have filed cross-motions for summary judgment pursuant to Fed. R. Civ. P. 56. For the following reasons, both cross-motions for summary judgment are DENIED.

## I.    Background

### A.    The Parties

Plaintiff American National Bank & Trust of Chicago ("ANB") is a national bank whose principal place of business is located in Chicago, Illinois. ANB has been dismissed from this action. Claimant and counterclaim plaintiff Alps is a Japanese corporation whose principal place of business is in Tokyo, Japan. Claimant and counterclaim plaintiff Mathias Burlet ("Burlet") is a citizen of the Republic of Switzerland and currently resides in Miami Beach, Florida.

---

[1] A default judgment has been entered as to defendant Donald West. The court anticipates that the remaining defendant, NIT Holdings Limited, will also make a claim for all or some of the $12 million at issue in this case.

Defendant and counterclaim defendant Donald West ("West") is an attorney who resides in Illinois. Defendant and counterclaim defendant NIT Holdings Limited ("NIT") is or was a corporation organized under the laws of the British Virgin Islands and, per Burlet's complaint, has a principal place of business in Illinois.

### B.    Jurisdiction and Venue

There are two types of interpleader actions: rule and statutory. Rule interpleader is proceeds under Rule 22(2) and jurisdiction is proper only if complete diversity exists between the stakeholder and all the claimants and the amount in controversy exceeds $75,000. 7 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 3d* § 1703 (2001). In contrast, statutory interpleader proceeds under 28 U.S.C. § 1335, and jurisdiction is proper if two or more of the adverse claimants are diverse and the amount in controversy exceeds $500. *Id.* This means that, for statutory interpleader, the citizenship of the stakeholder is irrelevant, and minimal diversity is enough to establish federal jurisdiction. *Id.*

Here, as noted above, the stakeholder is an Illinois citizen, the claimants are citizens of Japan, Switzerland, the British Virgin Islands, and Illinois, and the amount in controversy far exceeds the statutory minimum.[2] Thus, statutory interpleader jurisdiction is proper and the court may consider the merits. *See* 28 U.S.C. § 1335(a)(1); 28 U.S.C. § 1332. Moreover, venue is proper pursuant to 28 U.S.C. § 1397 because one of the claimants resides in this district.

---

[2] With respect to claimant Donald West, the parties have advised the court only that he resides in Illinois. Citizenship, not residency, is what matters for diversity jurisdiction. *Guaranty National Title Co. v. J.E.G. Associates*, 101 F.3d 57 (7th Cir. 1996). Here, however, regardless of whether West is a citizen of Illinois or elsewhere, diversity jurisdiction is proper because minimal diversity, not complete diversity, is the governing standard. Thus, even though the court only knows West's place of residency, jurisdiction is still proper. The parties should nevertheless rectify this error in any future filings.

## C.    Local Rules

Under the local rules, a party seeking summary judgment must file "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law" consisting of "short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in the at paragraph. Failure to submit such a statement constitutes grounds for denial of the motion." Local Rule 56.1(a)(3).

Presently before the court are cross-motions for summary judgment. This means that both claimants, Alps and Burlet, are both movants and nonmovants. As such, both have filed statements of undisputed material facts pursuant to Local Rule 56.1(a)(3). Unfortunately, both statements are deficient. Alps repeatedly cites to lengthy exhibits without providing pinpoint cites. Even worse, Alps cites to, for example, "Burlet Deposition" and relevant pages when its exhibits are labeled as "Exhibit A, B, C" and so forth. This forced the court to flip through all of the exhibits in search of the relevant information. The fact that these exhibits themselves contained multiple documents further compounded the problem.

In Burlet's statement, record cites were often simply incorrect. For example, Burlet cited to pages of an exhibit when those pages weren't included in that exhibit. Burlet also cited to entire exhibits without providing pinpoint cites. Although these defects could have led to the immediate rejection of both summary judgment motions, because this is a 1999 case, the court gamely continued on in an attempt to resolve this matter.

Local Rule 56.1(b) requires that the responding party submit a "concise response" to the movant's statement, which must contain "[a] response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to

affidavits, parts of the record, and other supporting materials relied upon...." Local Rule 56.1(b)(3)(A). Local Rule 56.1(b) also requires the responding party to submit "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon...." Local Rule 56.1(b)(3)(B). Finally, Local Rule 56.1(b) provides that "[a]ll material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party." *Id.*

Several problems exist with both parties' Local Rule 56.1(b) responses. Burlet commingled additional factual assertions into his responses to Alps' facts instead of simply admitting or denying Alps' facts and then including the additional facts in his statement of additional facts. Burlet also attempted to admit or deny facts by claiming they were inadmissible hearsay. In addition, Burlet discussed the legal effect of certain facts in his response instead of simply admitting or denying whether the fact was true or not.

Finally, Burlet attempted to deny Alps' factual assertions by claiming that they were immaterial. Alps is also guilty of several improper denials. As for record cites in the parties' responses, many of these are incorrect, leaving the court to fruitlessly hunt through the parties' submissions.

Failure to comply with Rule 12 is not a "harmless technicality." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994). Moreover, the court is not required to scour the record to unearth material factual disputes or evidentiary support for a party's position. *See, e.g., Carter v. Am. Oil Co.*, 139 F.3d 1158, 1162 (7th Cir. 1998). Thus, as noted above, a party who does not properly contest the opposing party's Rule 56.1(a)(3) facts is considered to have admitted those facts, to the extent that they are properly supported by the record. Rule

56.1(b)(3); *Midwest Imports, Ltd. V. Coval*, 71 F.3d 1311, 1312 (7th Cir. 1995); *Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 333 (7th Cir. 1993).

Because the Local Rule 56.1 statements are deficient, the already convoluted facts of this case have turned into a morass. Accordingly, to the extent that a party did not adequately deny a properly supported fact, that fact is deemed admitted. With that caveat, the following facts are derived from the parties' Rule 56.1 submissions.

### D. Facts

The following facts are undisputed unless otherwise indicated.

### 1. Alps's Investment in Northgold International Trust

Alps is a publicly traded company that produces and sells electronic components throughout the world. (Alps SOF, ¶ 86; Alps 1999 Annual Report). Alps had over $4.5 billion in sales in 1999. (Alps SOF, ¶ 86; Alps 1999 Annual Report). Yoshiaki Ichiyama ("Ichiyama") is Alps' Director of Finance, and Hiroshi Aihara ("Aihara") is the manager of Alps's Finance Department.

Early in 1999, Ichiyama and Aihara retained Toshimasa Yamada ("Yamada") as an investing consultant who was supposed to pursue potential investments for Alps in bond trading programs in Europe. (Alps SOF, ¶ 8; Affidavit of Toshimasa Yamada ("Yamada Aff"), ¶ 2). By late May of 1999, Yamada had risen in the ranks and was a director of the company. Burlet's Rule 56.1(b) Statement ¶ 8 & Exhibits 1–4; Burlet's 56.1(b)(3)(B) Statement, B24).

In fact, a document dated June 28, 1999, indicates that Aihara, Ichiyama, and Yamada were all directors (specifically, "Directores Statutory Auditors") of Alps. (Burlet's 56.1(b)(3)(B) Statement, B27; Burlet's Rule 56.1(b) Statement, Exhibit 3; Alps Response to Burlet's Rule 56.1(b)(3)(B) Statement, B27). The parties dispute whether this document is an Alps corporate

registration statement. (Burlet's Rule 56.1(b)(3)(B) Statement, B27; Alps Response to Burlet's Rule 56.1(b)(3)(B) Statement, B27). Alps claims that it never employed Yamada, pointing to Yamada's affidavit, in which he stated "I am not, and never was, an employee of Alps or a director of Alps." Alps 56.1(a), Ex. A, par. 2.[3] However, another corporate resolution, also dated June 28, 1999, gave Yamada "full power and authority to execute any and all documents necessary to conclude any and all bank transactions." Burlet's 56.1(b), Ex. 2. Yet another Alps' corporate resolution, dated May 28, 1999, provided that Mr. Toshimasa Yamada was "fully authorized, from the Alps Corporation/ Company with full responsibility . . . to have joint signature to the Anglo-Irish Bank ("AIB") Account... named Alps Electric Co. Ltd." Burlet's 56.1(b), Ex. 1 [*sic*].

At some point, Al Grillo introduced Yamada to Perry Hammer ("Hammer") and West. (Alps SOF, ¶ 12; Yamada Aff. ¶ 4(e)). Although the parties' filings are less than crystal clear as to Grillo's identity, it appears that he was either an employee or director of NIT or some entity in the so-called Northgold group of companies, or an external person who got Yamada involved with Hammer. Confusingly, Al Grillo's son, Michael Grillo, was somehow involved in these transactions as well.

In July of 1999, Yamada met twice with Hammer and West in Geneva, Switzerland. (Alps SOF, ¶ 10; Yamada Aff., ¶ 3). Hammer and West claimed that they represented Northgold International Trust ("Northgold"), a company involved in a bond-trading program in Europe. (Alps SOF, ¶¶ 11 &13; Yamada Aff., ¶ 4).[4]

---

[3] In further support of its assertion that it never employed Yamada, Alps also cites to its entire Annual Report. The court declines to scour this document looking for support for Alps' claimed facts.

[4] At this time, Grillo's son told Yamada that Hammer was a trader capable of obtaining profits near 200% per month. (Alps SOF, ¶ 12; Yamada Aff., ¶ 4(f)). Burlet, however, correctly notes

Hammer and West told Yamada that Northgold could buy bonds with a fixed interest rate from top banks in Europe at a large discount and then immediately resell them for profit. (Alps SOF, ¶ 14; Yamada Aff., ¶ 4). They also told him that a special condition of the program was that Northgold had to give 30% of its profits to either a charity or a public works project. (Alps SOF, ¶ 14; Yamada Aff., ¶ 4). Finally, they told him that Alps could participate in this bond trading program by depositing funds in an account in Alps's name and then having the bank issue a "bank guarantee," which Northgold would use to obtain a line of credit to conduct the trading program. (Alps SOF, ¶ 14; Yamada Aff., ¶ 4).[5]

On July 16, 1999, Yamada signed a Joint Venture Agreement ("Agreement") with Northgold on behalf of Alps to participate in this bond-trading program. (Alps SOF, ¶ 15; Yamada Aff., ¶ 7; Affidavit of Hiroshi Aihara ("Aihara Aff."), ¶ 3). Following the execution of the Agreement, Northgold and Hammer unsuccessfully tried to open a $120 million line of credit with the Anhyp Spaar Bank, N.V. in the Netherlands and the Credit European Bank. (Alps SOF, ¶¶ 16-17; Yamada Aff., ¶ 8; Burlet's Rule 56.1(b) Statement ¶ 16 and Exhibits 6-10). Northgold also unsuccessfully tried to arrange for a line of credit from the Anglo-Irish Bank in Vienna, Austria, where Alps had an account with over $13 million. (Alps SOF, ¶¶ 18 & 19; Yamada Aff., ¶ 9; Burlet's Rule 56.1(b) Statement ¶ 18 and Exhibits 13-17).

On the same day that Anglo-Irish Bank refused to provide financing, West informed Yamada that in order to participate in the trading program, Alps would have to transfer funds

---

that this statement is inadmissible hearsay as it is a statement, other than one made by the declarant, offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c); *United States v. Sweeney*, 688 F.2d 1131, 1144 (7th Cir. 1982). As such, the court will not consider it.
[5] Burlet claims that the allegations of ¶ 14 are inadmissible under the parol evidence rule. However, the legal effect of the statements is different from whether the statements happened, which he does not deny. Therefore, ¶14 is deemed admitted.

from its Anglo-Irish Bank account into a "client fiduciary account" at ANB, naming West as a fiduciary for Alps and Northgold. (Alps SOF, ¶¶ 20 - 21; Yamada Aff., ¶ 11).[6] West told Yamada that only attorneys, such as him, could open such an account, and that such an account imposed very strict obligations, including personal liability for misuse of the funds. (Alps SOF, ¶ 21; Yamada Aff., ¶ 11 & 17).

Based on West's representations about the account, on or about September 27, 1999,[7] Yamada transferred $12 million from Alps's Anglo-Irish Bank account to an account in the name of "Donald W. West CFA Northgold" at ANB. (Alps SOF, ¶ 22; Yamada Aff., ¶ 12; Burlet's Rule 56.1(b)(3)(B) Statement, B43).[8] The funds deposited in the fiduciary account at ANB did not belong to Alps. (Burlet's Rule 56.1(a) Statement, ¶ 27 & Exhibit D, ¶ 6, p. 3).[9] Although the funds were transferred into the ANB account in Alps' name and came from Alps's Anglo-Irish Bank account, the money actually belonged to a shareholder of Alps, Seto Industry, Inc. ("Seto"). (Burlet's Rule 56.1(a) Statement, ¶ 28 & Exhibit D, ¶ 6, p. 3).

As a precaution, around the time Yamada transferred the funds, he asked West to agree that the money would be returned to Alps's account at Anglo-Irish Bank if trading did not

---

[6] Burlet claims that the fiduciary account was to be in the name of "Northgold" rather than "West." However, the record does not support that claim. (Burlet's Rule 56.1(b) Statement ¶ 21 & 21 and Exhibit 18).

[7] There is some discrepancy about the date that the funds were transferred to ANB. Burlet alleges that the funds were transferred on September 22, 1999. (Burlet's Rule 56.1(b)(3)(B) Statement, B43 & Exhibit 19). Alps alleges that the funds were transferred on September 27, 1999. (Alps SOF, ¶¶ 30 & 31; Cygan Dep., p. 24).

[8] Burlet denies this allegation because he claims that the funds never belonged to Alps. (Burlet's Rule 56.1(b) Statement ¶ 22 and Exhibit 34, ¶ 6, pg. 3). However, Alps only alleges that the funds were transferred from its account, not that the funds belonged to it. Furthermore, the exhibit Burlet refers to states that Alps transferred Seto's money to Alps's Anglo-Irish Bank account and then transferred the funds to the ANB account. Therefore, the record supports Alps's allegation and it is deemed admitted because of Burlet's failure to properly deny it.

[9] Alps denies this allegation but appears to actually be denying ¶ 24 of Burlet's Rule 56.1(a) statement.

commence within seven days of the transfer. (Alps SOF, ¶ 29; Yamada Aff. ¶16). Yamada communicated these conditions to West by way of a handwritten letter dated September 24, 1999. (Burlet's Rule 56.1(b)(3)(B) Statement, B44; Burlet's Rule 56.1(b) Statement, Exhibit 20). Alps admits that Yamada sent such a letter and that it reflects an agreement between Yamada and West. (Alps Response to Burlet's Rule 56.1(b)(3)(B) Statement, B44).

West agreed to Yamada's request, and around September 27, 1999, $12 million was transferred from Alps's Anglo-Irish Bank account to ANB. (Alps SOF, ¶¶ 30 & 31; Yamada Aff. ¶17; Deposition of James G. Cygan ("Cygan Dep."), pp. 22-24, 29). On September 28, the funds were credited to the ANB account. (Alps SOF, ¶ 32; ANB Account Transaction History ("Transaction History"), p.1). The next morning, West changed the client name on the ANB account from Northgold Trust to NIT, opened up a "client fund account" (also referred to as a "CFA"), and began to make various wire transfers from the account. See Alps 56.1(a), Ex. C at 29-30.] (Alps SOF, ¶33; Cygan Dep., pp. 29-32). ANB was immediately suspicious because of the amount of money and the fact that West did not want to put the money into any interest-bearing instruments.[10]

### a.    Seto Industry, Inc.

At some point, due to delays in completing the purported trades, Aihara and Ichiyama decided not to invest Alps's money in the alleged Northgold trading program. (Burlet's Rule 56.1(b)(3)(B) Statement, B1 & B2; Alps Amended Answer to Burlet's Supplemental Interrogatories, n. 6, p. 3; Burlet's Rule 56.1(a) Statement, ¶ 30). However, acting as representatives of Seto, Aihara and Ichiyama transferred funds from a Seto account (the parties

---

[10] The ANB account to which $12 million was transferred from Alps's Anglo-Irish Bank account will be referred to as the ANB account or the NIT account.

do not identify the identity of the transferee bank) into Alps' account at the Anglo-Irish Bank in order to provide funds to use in the Northgold trading program. (Burlet's Rule 56.1(b)(3)(B) Statement, B4, Ex. 34 at 3; Alps Amended Answer to Burlet's Supplemental Interrogatories, n. 6, p. 3; Burlet's Rule 56.1(a) Statement, ¶ 29). These funds were ultimately transferred to the ANB account.

Although it is disputed whether Aihara knew that the funds in Alps's Anglo-Irish Bank account were transferred to the ANB account, it is undisputed that Yamada and Aihara both knew that the funds in Alps's Anglo-Irish Bank account had been transferred from Seto's account and therefore belonged to Seto. (Burlet's Rule 56.1(b)(3)(B) Statement, B22; Alps Response to Burlet's Rule 56.1(b)(3)(B) Statement, B22; Alps Amended Answer to Burlet's Supplemental Interrogatories, n. 6, p. 3; Burlet's Rule 56.1(a) Statement, ¶ 32).[11] Thus, the funds Yamada transferred to ANB from Alps's Anglo-Irish Bank account belonged to Seto, and not Alps. (Burlet's Rule 56.1(b)(3)(B) Statement, B3 & B4; Alps Amended Answer to Burlet's Supplemental Interrogatories, n. 6, p. 3).

Subject to costs incurred by Alps, the risk, principal, and profit of the investment with Northgold belong exclusively to Seto. (Burlet's Rule 56.1(b)(3)(B) Statement, B12; Alps Amended Answer to Burlet's Supplemental Interrogatories, n. 6, p. 3; Alps Response to Burlet's Rule 56.1(b)(3)(B) Statement, B12). Thus, any funds recovered as a result of this lawsuit, less any cost incurred in this matter, rightfully belong to Seto. (Burlet's Rule 56.1(b)(3)(B) Statement, B13; Alps Amended Answer to Burlet's Supplemental Interrogatories, n. 6, p. 3; Alps

---

[11] Burlet alleges that Yamada and Aihara knew that the funds sent to ANB did not belong to Alps. (Burlet's Rule 56.1(b)(3)(B) Statement, B22). However, whether Aihara knew of the transfer to ANB is disputed.

Response to Burlet's Rule 56.1(b)(3)(B) Statement, B13; Burlet's Rule 56.1(a) Statement, ¶ 38; Alps Rule 56.1(b) Statement, ¶ 38).

The record shows that Alps intended Seto to assume any risk associated with the Northgold investment and would be entitled to any principal and profit. (Burlet's Rule 56.1(a) Statement, ¶ 33; Alps Amended Answers to Defendant/Cross-Plaintiff Mathias Burlet's Supplemental Interrogatories ("Alps Amended Answers to Burlet's Supplemental Interrogatories"), ¶ 6, p. 3). However, Alps denies Burlet's claim that Aihara and Ichiyama agreed that Seto would take the entire risk of the investment and be entitled to all profits and the entire principal if it was returned. (Burlet's Rule 56.1(a) Statement, ¶ 32; Alps Rule 56.1(b) Statement, ¶ 33). According to Alps, one of its subsidiaries loaned Seto the money that was used to make the investment. (Alps Rule 56.1(b) Statement, ¶ 33 and Exhibit 2 (Alps's Supplemental Answers to Defendant/Cross-Plaintiff Mathias Burlet's Supplemental Interrogatories ("Alps's Supplemental Answers to Burlet's Supplemental Interrogatories").[12]

The parties agree that the investment was only made using Alps's bank account because Ichiyama and Aihara believed that the investment could only be made in Alps's name. (Burlet's Rule 56.1(a) Statement, ¶ 34; Alps Rule 56.1(b) Statement, ¶ 34). Ichiyama, Aihara, and Yamada took the steps necessary to use the Seto funds to make the investment with Northgold, including transferring the funds from Seto's account to the Alps account at Anglo-Irish Bank. (Burlet's

---

[12]   The court assumes that Alps is trying to argue that it bore part of the risk and has an interest in the principal and any profit. However, Alps does not directly say this, and this fact is inconsistent with facts listed above indicating that the money was, in fact, Seto's. This is simply another illustration of the conflicting and disputed facts in this case.

Rule 56.1(a) Statement, ¶ 35; Alps Amended Answers to Burlet's Supplemental Interrogatories, ¶ 6, p. 3).[13]

There is no evidence that Yamada was ever an employee or agent of Northgold, NIT, Hammer, or West. (Burlet's Rule 56.1(b)(3)(B) Statement, B17; Alps SOF, Exhibit A). There is also no evidence that any officer, employee, or agent of Alps other than Yamada ever directly discussed or otherwise communicated with Grillo, West, or Hammer about the investment program described in the Agreement. (Burlet's Rule 56.1(b)(3)(B) Statement, B9; Alps Response to Burlet's Rule 56.1(b)(3)(B) Statements, B9). Lastly, there is no evidence that Aihara or Ichiyama ever directly discussed or otherwise communicated with Grillo, West, or Hammer about the investment program described in the Agreement. (Burlet's Rule 56.1(b)(3)(B) Statement, B10; Alps Response to Burlet's Rule 56.1(b)(3)(B) Statements, B10).

The parties disagree as to whether there is any evidence that Alps or Seto conducted "due diligence" investigations regarding the investment described in the Agreement. (Burlet's Rule 56.1(b)(3)(B) Statement, B11 & B16; Alps Response to Burlet's Rule 56.1(b)(3)(B) Statements, B11 & B16). Burlet claims that there is no evidence of such an investigation by either Alps or Seto. (Burlet's Rule 56.1(b)(3)(B) Statement, B11 & B16). Alps points to the efforts taken by Yamada to learn about the investment program. (Alps Response to Burlet's Rule 56.1(b)(3)(B) Statements, B11 & B16; Alps SOF, ¶¶ 10-15; Yamada Aff., ¶¶ 3, 4 & 7; Aihara Aff., ¶ 3).

Alps is not a shareholder of Seto. (Burlet's Rule 56.1(b)(3)(B) Statement, B5; Alps Amended Answer to Burlet's Supplemental Interrogatories, n. 5, p. 2). At all times relevant to

---

[13] Alps denies this allegation but did not point to evidence sufficient to make it a disputed fact under the local rules. (Alps Rule 56.1(b) Statement, ¶ 35 and Exhibit 2; Burlet's 56.1(b) Statement, Exhibit 34)

this case, Seto's only two directors were Masataka Kataoka ("Masataka") and Katsutaro Kataoka ("Katsutaro"). (Burlet's Rule 56.1(b)(3)(B) Statement, B6; Alps Amended Answer to Burlet's Supplemental Interrogatories, n. 3, p. 2).[14] There is no evidence that Matsataka or Katsutaro ever directly discussed or otherwise communicated with Grillo, West, or Hammer about the investment program described in the Agreement. (Burlet's Rule 56.1(b)(3)(B) Statement, B8; Alps Response to Burlet's Rule 56.1(b)(3)(B) Statements, B8).

**b.    Yamada's Authority to Transfer Funds from Anglo-Irish Bank to ANB**

In June of 1999, Aihara informed Anglo-Irish Bank that Yamada was a director of Alps with joint signature authority over the corporation's account.[15] (Burlet's Rule 56.1(b)(3)(B) Statement, B28 & Exhibit 4). Two signatures were required for any transaction involving Alps's account at Anglo-Irish Bank, Yamada's and Aihara's. (Alps SOF, ¶ 24; Yamada Aff., ¶ 13; Aihara Aff., ¶ 5).

According to Burlet, Alps's Board of Directors gave Yamada joint signature authority over the Anglo-Irish Bank account via corporate resolution. (Burlet's 56.1(b)(3)(B) Statement, B25; Burlet's Rule 56.1(b) Statement, Exhibit 1). However, Alps disputes that the exhibit Burlet refers to is a resolution of Alps's Board of Directors. (Alps Response to Burlet's Rule 56.1(b)(3)(B) Statement, B25).

Burlet also claims that Yamada was given "full power of authority to execute any and all documents necessary to conclude any and all bank transactions" by way of a corporate resolution of Alps's Board of Directors. (Burlet's 56.1(b)(3)(B) Statement, B26; Burlet's Rule 56.1(b)

---

[14] Burlet's allegation that Masataka and Katsutaro are also directors of Alps is not supported by Burlet's reference to Exhibit J of Alps's SOF.

[15] The account number is 204-700. Aihara notified Anglo-Irish Bank of Yamada's authority via a transmission marked "Urgent." (Burlet's Rule 56.1(b)(3)(B) Statement, B28 & Exhibit 4).

Statement, Exhibit 2).[16] Alps admits that is what the cited exhibit states, but disputes that it is a resolution of Alps's Board of Directors. (Alps Response to Burlet's Rule 56.1(b)(3)(B) Statement, B26; Burlet's Rule 56.1(b) Statement, Exhibit 2).

Alps alleges that Yamada did not inform Ichiyama, Aihara, or anyone else at Alps that he was transferring the money and that they were unaware of the transfer until this lawsuit was filed in October 1999. (Alps SOF, ¶ 23 & 28; Yamada Aff., ¶¶ 14 & 16; Aihara Aff., ¶ 6). There is no evidence that either Aihara or Ichiyama communicated with Hammer or West regarding the investment prior to the funds from Alps's Anglo-Irish Bank account being sent to the client fiduciary account at ANB. (Burlet's Rule 56.1(a) Statement, ¶ 37 and Exhibit D, p. 3; Alps Rule 56.1(b) Statement, ¶ 37). Since Yamada believed that Aihara would not approve moving the funds, he instructed the Anglo-Irish Bank to transfer the funds to ANB without the knowledge of Aihara or anyone else at Alps and forged Aihara's signature on that instruction. (Alps SOF, ¶¶ 24-27; Yamada Aff., ¶¶ 13 - 15; Aihara Aff., ¶¶ 5 & 7).

### c. The ANB Fiduciary Account

On or about September 26, 1999, Hammer wrote to Yamada to confirm that Northgold had received notice of the order to transfer funds to the Northgold account at ANB. (Burlet's Rule 56.1(b)(3)(B) Statement, B45; Burlet's Rule 56.1(b) Statement, Exhibit 21). Alps admits that Yamada received such a letter but denies that it received such a letter. (Alps Response to Burlet's Rule 56.1(b)(3)(B) Statement, B45).[17] On or about September 28, 1999, ANB notified

---

[16] It appears that the account that Yamada was given full authority on is different than the Anglo-Irish Bank account at issue in this matter. The Anglo-Irish Bank account from which the $12 million was transferred to ANB was located in Vienna, Austria. (Yamada Aff., ¶ 9). Yamada was given full authority on an account he was directed and authorized to open in Geneva, Switzerland. (Burlet's 56.1(b) Statement, Exhibit 2).

[17] This is the first of several instances where Alps distinguishes itself from Yamada with regard to correspondence.

West that the funds had been received into the NIT account. (Burlet's Rule 56.1(b)(3)(B) Statement, B46; Burlet's Rule 56.1(b) Statement, Exhibit 22).

On September 29, 1999, West made the following transfers: [18]

1.    $15,000 to Northgold USA, one of Hammer's companies; (Alps SOF, ¶34(a); Transaction History);

2.    $200,000 to the West Family Trust; (Alps SOF, ¶34(a); Transaction History);

3.    $450,000 to the Bank of Ukraine for the account of Mykola Ilyasov ("Ilyasov"), a business associate of Hammer and Burlet; and (Alps SOF, ¶34(a); Transaction History; Deposition of Mathias Burlet ("Burlet Dep."), pp. 53-54, 105, 145, 164); and

4.    $135,000 to W.P. Santos, Assistant Secretary of Northgold USA. (Alps SOF, ¶34(a); Transaction History; Letter from Northgold USA dated November 3, 1999).

On September 30, 1999, ANB was directed to transfer $10 million to an account at Raymond James, a brokerage house in Florida, but that transfer was rejected. (Alps SOF, ¶ 34(b); Transaction History). In October 4, 1999, $100,000 was transferred to Welles Construction, a creditor of West's. (Alps SOF, ¶ 34(c); Transaction History; Deposition of James J. Power ("Power Dep."), p. 35). A $550,000 transfer was made to W.P. Santos on October 5, 1999. (Alps SOF, ¶ 34(d); Transaction History). Then, on October 6, 1999, $50,000 was transferred to the West Family Trust. (Alps SOF, ¶ 34(e); Transaction History). Finally, on

---

[18] Burlet admits to the transfers alleged in ¶ 34 but objects to Alps's characterization of the people and entities to which the transfers were made. Burlet claims that characterizations such as "principals," "business associates," and "West's creditors" are inadmissible hearsay. This is besides the point because Alps' fraud claim against West, NIT, Northgold, etc., turns on the fact that the funds left in the ANB account and were not used or invested in the trading program. In any event, Burlet does not cite any support for his objection to the characterizations of these parties. In his response, he cites to exhibit 34 attached to his 56.1(b) in its entirety, but as support for (or so it seems) the idea that the funds in question never belonged to Alps.

October 7, 1999, $308,000 was transferred to Belo Management's account at the Deutsche Bank. (Alps SOF, ¶ 34(f); Transaction History; Deposition of Jeffrey Lillien ("Lillien Dep."), p. 55).

Around October 12, 1999, West wrote to Aihara about the ANB account in which its funds were deposited. In that letter, West advised Aihara that he had established a fiduciary account at ANB with the funds from Alps' Anglo-Irish Bank account to allow Alps to participate in the trading program as outlined in the Joint Venture Agreement. He also stated that ANB had requested a copy of the resolution of the Alps' board of directors because ANB wanted proof that the transaction was authorized. (Burlet's Rule 56.1(b)(3)(B) Statement, B47; Burlet's Rule 56.1(b) Statement, Exhibit 23). Alps admits that West wrote such a letter, but claims that it was sent to Yamada and that Aihara did not receive it. (Alps Response to Burlet's Rule 56.1(b)(3)(B) Statement, B47; Alps SOF, Exhibit A, ¶¶ 13-15 and Exhibit B, ¶¶ 6-8).

Burlet claims that, on or about October 13, 1999, Aihara sent West a letter and an Alps board resolution dated June 28, 1999, authorizing Yamada to act for the corporation with respect to the $12 million which was sent to the Northgold account at ANB. (Burlet's Rule 56.1(b)(3)(B) Statement, B48; Burlet's Rule 56.1(b) Statement, Exhibit 24). Burlet further alleges that the document was signed by Ichiyama and attested to by Aihara. (Burlet's Rule 56.1(b)(3)(B) Statement, B48; Burlet's Rule 56.1(b) Statement, Exhibit 24). On the other hand, Alps claims that Yamada drafted the letter, Aihara signed it, and then Yamada attached false board resolutions dated June 28, 1999. (Alps Response to Burlet's Rule 56.1(b)(3)(B) Statement, B48; Alps SOF, Exhibit B, ¶¶ 6-11; Alps Response to Burlet's Rule 56.1(b)(3)(B) Statement, Exhibit 1).

On or about October 19, 1999, Yamada wrote to West and instructed him that if no investment activity took place within the next seven days, the funds were to be returned to the

-16-

Anglo-Irish Bank account. (Burlet's Rule 56.1(b)(3)(B) Statement, B49; Burlet's Rule 56.1(b) Statement, Exhibit 25). Alps admits that Yamada wrote and sent the letter, but denies that it knew about the letter or sent it. (Alps Response to Burlet's Rule 56.1(b)(3)(B) Statement, B49; Alps SOF, Exhibit A, ¶¶ 13-15 and Exhibit B, ¶¶ 6-8).

Around October 21, 1999, Yamada wrote to West, seeking confirmation of the transfer of funds and informing West that Alps would consider continuing trading if the funds were in an Alps account and no longer in the trust account. (Burlet's Rule 56.1(b)(3)(B) Statement, B50; Burlet's Rule 56.1(b) Statement, Exhibit 26). Alps denies that it sent that letter. (Alps Response to Burlet's Rule 56.1(b)(3)(B) Statement, B50; Alps SOF, Exhibit A, ¶¶ 13-15 and Exhibit B, ¶¶ 6-8). Also around October 21, 1999, West wrote to Yamada and stated that ANB had frozen their account for all transfers until it completed an investigation into the source of the funds. (Burlet's Rule 56.1(b)(3)(B) Statement, B51; Burlet's Rule 56.1(b) Statement, Exhibit 27). Alps denies that it received a copy of that letter, which was sent to Yamada. (Alps Response to Burlet's Rule 56.1(b)(3)(B) Statement, B51; Alps SOF, Exhibit A, PP 13-15 and Exhibit B, ¶¶ 6-8).

On or about October 22, 1999, West faxed a letter to Yamada stating that the trading had begun three days after the funds were received, that questions regarding the source of Alps's funds had caused a delay in the settlement procedures on those trades, and that in accordance with the terms of the Agreement, Alps should have no further contact with the bank. (Burlet's Rule 56.1(b)(3)(B) Statement, B52; Burlet's Rule 56.1(b) Statement, Exhibit 28). Alps denies that it received a copy of that letter, which was sent to Yamada. (Alps Response to Burlet's Rule 56.1(b)(3)(B) Statement, B52; Alps SOF, Exhibit A, ¶¶ 13-15 and Exhibit B, ¶¶ 6-8).

Around October 28, 1999, West faxed a memo to Yamada explaining why the name on the account was changed from Northgold Trust to NIT Holdings Limited, and informing Yamada that West was not Alps's lawyer. (Burlet's Rule 56.1(b)(3)(B) Statement, B53; Burlet's Rule 56.1(b) Statement, Exhibit 29). At about the same time, Yamada wrote to West to terminate the Agreement between Alps and Northgold and demand that Northgold return Alps's $12 million investment, as well as any profit, within five days. (Burlet's Rule 56.1(b)(3)(B) Statement, B54; Burlet's Rule 56.1(b) Statement, Exhibit 30).

On or about October 30, 1999, Hammer wrote to Yamada and asked for a status regarding the trading program. (Burlet's Rule 56.1(b)(3)(B) Statement, B55; Burlet's Rule 56.1(b) Statement, Exhibit 31). Alps admits that Hammer sent that letter to Yamada but denies that Hammer, Northgold, or NIT were participating in a trading program. (Alps Response to Burlet's Rule 56.1(b)(3)(B) Statement, B55; Alps SOF, ¶ 33-53).

### 2.    ANB's Initiation of this Interpleader Action

ANB began an investigation into Alp's account because its internal auditors concluded that the transfers seemed suspicious. (Alps SOF, ¶ 35; Lillien Dep., pp. 5-12; Cygan Dep., pp. 29-37).[19] As a result of this investigation, ANB froze Alps's ANB account on October 8, 1999, pending further investigation. (Alps SOF, ¶ 36; Lillien Dep., p.12).

Meanwhile, back on October 1, 1999, Hammer told Yamada that the first trade had been completed and that Alps would receive its $308,000 profit on October 8, 1999. (Alps SOF, ¶ 37;

---

[19] Alps claims that the investigation was prompted in part by West's inability to describe the trading program he was involved in. (Alps SOF, ¶ 35). However, the testimony Alps cites does not support that claim. Burlet objects to the characterization of the transactions as "suspicious" and asserts that the record does not support Alps's allegation that West was "unable" to describe the trading program. However, Burlet does not provide proper evidentiary support either. (Burlet's 56.1(b) Statement, ¶ 35).

Yamada Aff., ¶18). On October 7, 1999, West wrote to Yamada and confirmed that Alps would receive its $308,000 profit from a Deutsche Bank account on October 8, 1999. (Alps SOF, ¶ 38; Yamada Aff., ¶ 19). According to Yamada, however, the $308,000 was never wired to Alps's Anglo-Irish Bank account. (Yamada Aff., ¶ 20).

Bank One is a parent bank of ANB. (Alps SOF, ¶ 39; Lillien Dep., pp. 12-42). Two Bank One employees, attorney Jeffrey Lillien and investigations manager James Power, spoke to West on several occasions during the week of October 11, 1999, to give him an opportunity to explain the situation. (Alps SOF, ¶ 39; Lillien Dep., pp. 12-42). During one of those conversations, West stated that he needed the funds released to complete a bond trade that was pending. (Alps SOF, ¶ 40; Lillien Dep., pp. 29-30).

When asked for details about the trade program, West showed Lillien and Powers a copy of a draft supplement to a prospectus from Sudwestedeutsche Landesbank ("SDL"), in which SDL was allegedly selling its bonds. (Alps SOF, ¶ 41; Lillien Dep., pp. 24-25). According to handwritten notes in the draft supplement, the purchase price for the bonds was to be 78% of their face value. (Alps SOF, ¶ 42; Lillien Dep., pp. 27-28). The parties dispute whether a 22% discount is normal; Alps alleges that the normal discount is 0.5% and Burlet claims the 0.5% value represents the normal "spread" between buy and sell prices and not the discount rate offered on the instruments. (Alps SOF, ¶ 42; Lillien Dep., pp. 27-28; Burlet's Rule 56.1(b) Statement, ¶ 42; Exhibit 35).

Lillien contacted Bank One's credit department in London and learned that SDL had merged with another German institution and that it was no longer issuing or selling bonds in the name of SDL. (Alps SOF, ¶ 44; Lillien Dep., pp. 34-35). When Lilllien relayed that information to West, West told Lillien that a representative of SDL named Don Porter would call Lillien to

confirm the legitimacy of the SDL bond sale. (Alps SOF, ¶ 45; Lillien Dep., pp. 37-39). Lillien

contacted a manager at SDL who informed him that no one by the name of Don Porter worked

for SDL. (Alps SOF, ¶ 46; Lillien Dep., pp. 39-40). The bank's investigation manager, Power,

conducted a background check on Hammer and concluded that his proposed transactions did not

appear to have any validity and that he was not someone with whom ANB was interested in

doing business. (Alps SOF, ¶ 47; Power Dep., pp. 11-12).[20]

Based on the conversations with West, the wire transfers, the name change on the

account, the background check on Hammer, and the discount price West was receiving on the

bonds, Lillien, Powers, and ANB concluded that West and NIT were involved in a fraudulent

investment scheme and filed the present interpleader action. (Alps SOF, ¶ 48 & 49; Lillien Dep.,

pp. 51-52; Cygan Dep., p. 54; Power Dep., pp. 13, 42-43).[21]

Upon learning of the interpleader action, Yamada wrote a letter to West inquiring about

the transfers. (Alps SOF, ¶ 50; Yamada Aff., ¶¶ 21 & 22). West claimed that some of the funds

---

[20] Burlet admits the allegations from ¶¶ 44-47 but claims that they are inadmissible hearsay. This does not appear to be correct, in that the cited evidence is supported by Power's deposition testimony discussing what he did to conduct an investigation of the proposed transactions and the trading program, not what someone else said or did. However, Lillen testified about what representatives of another bank told him about a purported trade. *See* Alps 56.1(a), Lillen Dep. (Ex. H) at 34-35, 37-39, 39-40. Hence, Power's statements are not hearsay. *See* Fed. R. Evid. 801(c). However, to the extent that Lillen's testimony refers to statements of individuals other than Lillen or statements made by Lillen at a time other than his deposition, Lillen's testimony is inadmissible hearsay, which the court will not consider. Fed. R. Evid. 801(c); *United States v. Sweeney*, 688 F.2d 1131, 1144 (7th Cir. 1982).

[21] Burlet admits the allegations in ¶¶ 48 & 49 but claims that they are inadmissible opinion testimony by individuals who admitted at their depositions that they were not experts in the types of transactions involved in this matter. Because the witnesses do not claim to be experts, however, the witnesses are entitled to opine within the scope of their knowledge, as a witness need not be an expert to offer an opinion. *See* Fed. R. Evid. 701 ("[u]nder the Federal Rules of Evidence, a witness who is not an expert may testify about opinions or inferences formed that are based on the witness's perception and helpful to a clear understanding of the witness's testimony or the determination of a fact at issue"); *Stagman v. Ryan*, 176 F.3d 986, 995-96 (7th Cir. 1999). Accordingly, these allegations are admissible, and are hence admitted.

were transferred as "loading fees" in connection with the investment facility. (Alps SOF, ¶51; Yamada Aff., ¶ 22). Further, West claimed that the payment to the Bank of Ukraine (Mr. Ilayosav) was to the actual purchaser of the bonds and that the $200,000 paid to West was money Hammer owed him from a prior transaction. (Alps SOF, ¶51; Yamada Aff., ¶ 22).[22] The Agreement does not indicate that Northgold had authority to use the funds to pay debts owed to West. (Alps SOF, ¶ 52; Joint Venture Agreement).

Furthermore, according to Alps, the Agreement assigns Northgold responsibility for paying the loading fees. (Alps SOF, ¶52; Yamada Aff., ¶ 22; Joint Venture Agreement). The Agreement itself, however, says that unless Northgold discloses a particular expense it incurs prior to the initiation of the relevant transaction and Alps accepts joint responsibility for the expense in writing, loading fees are Northgold's sole responsibility. (Joint Venture Agreement, p. 4). Alps thus does not appear to have accepted responsibility for any loading fees.

Alps also contends that a $450,000 transfer was not really made to the purchaser of the bonds. (Alps SOF, ¶ 53; Burlet Dep., p. 145). "What transfer is this?" asks the hapless reader. The court cannot shed any light on this seemingly random fact, which is supported by a seemingly random page of a deposition which refers to a $500,000 transaction. At this point in its recitation of the "undisputed facts," Alps is discussing Perry Hammer's explanation to ANB of why the suspicious transfers were made. According to Alps' version of the facts, as substantiated by Yamada's affidavit (which is hearsay, as noted by Burlet), Hammer said that the

---

[22] Burlet admits the allegations in ¶¶ 50 & 51 but claims that they are inadmissible hearsay. This is correct because the allegations are statements not made by the declarant that are offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c); *United States v. Sweeney*, 688 F.2d 1131, 1144 (7th Cir. 1982). Specifically, the allegations in ¶¶ 50 and 51 are supported by Yamada's affidavit, in which Yamada says what Hammer said to him. Because the statements are offered for their truth, they are hearsay.

transfers were "loading fees." See Alps 56.1(a), Burlet Dep. (Ex. E) at 145. It is unclear what, if anything, this all means. Burlet nevertheless disputes these facts, asserting that the testimony does not support Alps's allegation. (Burlet's Rule 56.1(b) Statement, ¶ 53).

Getting back to an attempt to provide a chronological summary of the transactions, on October 29, 1999, Yamada sent West a fax, terminating the Agreement and demanding that the $12 million be returned. (Alps SOF, ¶ 54: Yamada Aff., ¶ 23). Initially, West refused to give back the money, but on November 18, 1999, he sent a letter to ANB directing it to return the funds in the ANB account to Alps. (Alps SOF, ¶ 55 & 56; Yamada Aff., ¶ 24; November 18, 1999 letter from West to ANB).

### 3.    Mathias Burlet

Mathias Burlet claims to be the sole owner of a bill of exchange, No. 5888-152/2E, issued by Northgold U.S.A. Industries, Inc. ("Northgold USA") in the amount of $10 million. (Burlet's Rule 56.1(a) Statement, ¶ 4; Burlet Affidavit ("Burlet Aff."), ¶ 2). Based on that instrument and an alleged "guarantee," Burlet claims a right to the funds in the ANB account. (Alps SOF, ¶ 85). To understand the basis of this claim, the court must delve into more tangled and largely disputed facts.

In the early nineties, Burlet invested in a treasure hunting operation that allegedly discovered a sunken treasure ship containing over $600 million in uncut emeralds. (Alps SOF, ¶ 57; Burlet Dep., p. 20). Although Burlet allegedly owned over seventy percent of the company at the time the treasure was discovered, he accepted $47 million in uncut emeralds in full settlement of his share in the venture. (Alps SOF, ¶ 58; Burlet Dep., pp. 21-23). Burlet never actually had physical possession of, or even saw, the emeralds he allegedly owned. (Alps SOF, ¶ 59; Burlet Dep., pp. 188-189).

-22-

According to Burlet, the emeralds were originally stored at the Commonwealth Bank in Kentucky and subsequently were moved to a warehouse at a free port in South Hampton, England. (Alps SOF, ¶ 60 & 61; Burlet Dep., pp. 32, 79-80). Burlet asserts that he agreed not to sell the emeralds for five years so that the value of emeralds would not decrease due to an increased number of stones on the market. (Alps SOF, ¶ 62; Burlet Dep., pp. 25-26).

### a. Bills of Exchange

In late 1997, Burlet met Mr. Bergener, (whose first name Burlet does not remember), the representative of a Hungarian company known as Bergener Finanz R.T. ("Bergener RT"). (Alps SOF, ¶ 63; Burlet Dep., pp. 29-30). After a single meeting with Mr. Bergener, Burlet sold his emeralds to Bergener RT for approximately $57 million worth of bills of exchange, payable ninety days from the date of issue. (Alps SOF, ¶ 64; Burlet Dep., pp, 30-31, 38, 87). For an additional $50 million bill of exchange, Burlet also sold Bergener RT a license to produce a small pleasure boat with an integral boat trailer. (Alps SOF, ¶ 65; Burlet Dep., pp. 67, 70-71). The only financial information Burlet had about Bergener RT prior to doing business with Mr. Bergener was a verbal verification from one of his banks that he was good for $100 million. (Alps SOF, ¶ 64; Burlet Dep., p. 87).

The bills of exchange Burlet received from Bergener totaled $107 million. (Alps SOF, ¶ 66; Burlet Dep., pp. 30-31, 67). Three bills of exchange in the amounts of $20 million, $30 million and approximately $7 million were given in payment for the emeralds. (Alps SOF, ¶ 66; Burlet Dep., pp. 30-31). One bill of exchange in the amount of $50 million was given in payment for the pleasure boat license. (Alps SOF, ¶ 66; Burlet Dep., p. 67).

In the middle of January 1998, Burlet learned that on January 8th or 9th, Bergener had been arrested and imprisoned in Austria on charges having to do with an investment and missing

money.  (Alps SOF, ¶ 68; Burlet Dep., pp. 42-43, 46).  The Bergener RT bills of exchange matured in the first week of February 1998. (Alps SOF, ¶ 67; Burlet Dep., p. 108).  Burlet tried to present the $7 million Bergener RT bill of exchange for payment. (Alps SOF, ¶ 69; Burlet Dep., pp. 89, 102).  However, the bank refused to honor the bill because of Bergener's imprisonment in Austria and the bill has not been honored since.  (Alps SOF, ¶ 69; Burlet Dep., pp. 89, 102).

In March 1998, Burlet gave Ivan Bliznakov ("Bliznakov") the two remaining Bergener RT bills of exchange in the total amount of $50 million, plus the $50 million Bergener RT bill of exchange for the boat license.  (Alps SOF, ¶ 70; Partnership Agreement between Bliznakov and Burlet dated March 20, 1998 ("Partnership Agreement").  Bliznakov was to manage the $100 million in Bergener RT bills of exchange and split the profits with Burlet.  (Alps SOF, ¶ 71; Partnership Agreement, Sections 1 & 3).  It was Burlet's understanding that $30 million was to be used to fund a satellite project in the Ukraine that was being developed by Bliznakov and Ilyasov.  (Alps SOF, ¶ 72; Burlet Dep., pp. 46, 52, 95, 115).  Burlet and Bliznakov entered into this agreement despite the fact that Bergener was in jail and the bank would not talk to Burlet about Bergener RT.  (Alps SOF, ¶ 73; Burlet Dep., p. 103).[23]

In July 1998, Bliznakov entered into a finance contract with Northgold.  (Alps SOF, ¶ 74; Burlet Dep., pp. 64-65).[24]  However, Hammer and Northgold never actually loaned any money to Bliznakov.  (Alps SOF, ¶ 75; Burlet Dep., p. 116).

---

[23] Alps references p. 60 but did not include that page of the deposition. The pages Alps included do not support its allegation that the satellite project was named "Ariadna."

[24] The court will not consider the remaining allegations in paragraph 74 because the deposition pages cited by Alps (Burlet Dep. at 64-65) do not support the facts relating to the alleged date of transfer, the amount of money transferred, the fact that the money was transferred in the form of Bergener RT bills of exchange, and that Northgold gave Bliznakov a $30 million loan in exchange for the bills of exchange.

In November of 1998, Bliznakov and Jerry Hrynash ("Hrynash") received 18 million pounds in bills of exchange from Hammer and Northgold, payable to Hillmar Ltd. ("Hillmar"), a British corporation. (Alps SOF, ¶ 76; Burlet Dep., pp. 127-128; Burlet Aff., ¶ 3).[25] However, when the first of these bills of exchange was presented for payment, it bounced and the bank's fraud department recommended cancellation of the Hammer and Northgold account. (Alps SOF, ¶ 77; Burlet Dep., pp. 128-129; Burlet's Rule 56.1(a) Statement, ¶ 5; Burlet Aff., ¶ 3).

Northgold USA subsequently issued new bills of exchange totaling 30 million U.S. dollars. (Alps SOF, ¶ 78; Burlet Dep., pp. 130-131). Alps denies that the Northgold USA bill of exchange is enforceable. (Alps Rule 56.1(b) Statement, ¶¶ 4 & 5; Alps SOF, ¶¶ 63-80). The new Northgold USA bills of exchange were payable in April of 1999. (Alps SOF, ¶ 79 & 80; Burlet Dep., p. 130, 132-133, 137-138). Burlet presented the first bill of exchange for payment on about April 12, 1999. It was not, however, paid at that time, and to the present date, neither Hillmar nor Burlet have received any payment pursuant to the bill of exchange. (Burlet's Rule 56.1(a) Statement, ¶ 7; Burlet Aff., ¶ 3).

Burlet became the sole owner of the bill of exchange on about April 30, 1999, when Hillmar assigned it to him. (Burlet's Rule 56.1(a) Statement, ¶ 8 & 9; Burlet Aff., ¶ 4). The parties dispute whether Burlet owns the bill of exchange free and clear of any adverse claims or set-offs. (Burlet's Rule 56.1(a) Statement, ¶ 10; Burlet Aff., ¶ 4; Alps Rule 56.1(b) Statement, ¶ 10; Alps SOF, ¶¶ 63-80).

---

[25] The parties dispute whether Burlet is a shareholder in Hillmar. (Burlet's Rule 56.1(a) Statement, ¶ 6 and Exhibit B, pp. 64, 93, and Exhibits attached thereto; Alps Rule 56.1(b) Statement, ¶ 6).

### b.     Guarantee

Burlet alleges that he is the owner of a document executed by Perry Hammer guaranteeing payment of any negotiable instrument issued by or on behalf of Northgold International Trust or any Northgold Group of Companies. (Burlet's Rule 56.1(a) Statement, ¶ 11 & 13; Burlet Aff., ¶ 5; Affidavit of Jerry Hrynash ("Hrynash Aff."), pp. 84-99).[26]  The guarantee binds Northgold International Trust & Northgold Group of Companies, including but not limited to Northgold International Inc. and Northgold (USA), to pay the bill of exchange. (Burlet's Rule 56.1(a) Statement, ¶ 15; Burlet Aff., ¶ 5 & Exhibit C).

After Burlet learned that Ilyasov, one of his business associates on the satellite project, received $500,000 from Hammer, he wanted more information about Hammer's money. (Alps SOF, ¶ 81 & 82; Burlet Dep., p. 145, 156-157). Burlet caused Hammer to believe he was working with the Fernandas Nicklas Trust to find out the location of Hammer's $10 million. (Alps SOF, ¶ 82; Burlet Dep., pp. 156-157).[27]  Although Alps alleges that Burlet tricked Hammer into believing that he was going to help him find an investment for the $10 million frozen in the ANB account, the cited testimony does not mention anything about ANB or Burlet helping Hammer find an investment.

---

[26] Burlet alleges that Hammer is the chief executive officer of the Northgold group of companies. (Burlet's Rule 56.1(a) Statement, ¶14;  Burlet Aff., ¶ 5). However, as Alps points out, Burlet does not claim to have personal knowledge as to who the Chief Executive Officer of NIT was as of the date of the alleged guarantee. (Alps Rule 56.1(b) Statement, ¶ 14).

[27] Burlet's deposition refers to the "Fernandas Nicklas" Trust. (Burlet Dep., Alps 56.1(a), Ex. E, pp. 156-59).  However, the record also contains references to the "Fernandes Nicholas Trust" as well as an affidavit from a Dr. Nicholas Fernandes stating that he runs the Pharao Trust, which is an entity that Burlet was going to put Perry Hammer in touch with to help Hammer obtain financing (this was the purported consideration for Burlet's November 8, 1999 guaranty).

According to Alps, the Fernandas Nicklas Trust was a fictitious company used by Burlet to cause Hammer to execute the alleged November 8, 1999, guarantee. (Alps Rule 56.1(b) Statement, B3; Alps SOF, Exhibit E, pp. 156-158). [28]

In connection with Hammer's attempts to obtain financing from the Fernandas Nicklas Trust, Hammer faxed Burlet a letter on November 8, 1999, addressed to "to whom it may concern. (Alps SOF, ¶ 8; Burlet Dep., pp. 158-159). [29] Burlet asserts that the letter addressed to "to whom it may concern" was a guarantee issued by the Northgold Group of Companies based on an agreement reached between Hammer and Jerry Hrynash, who had negotiated with Hammer on Burlet's behalf. (Burlet's Rule 56.1(b) Statement, ¶ 83; Deposition of Jerry Hrynash ("Hrynash Dep."), pp. 88-99).

Burlet did not make any promise, pay any money, or provide any other consideration to Hammer for the guarantees. (Alps SOF, ¶ 84; Burlet Dep., p. 159). Confusingly, the record also shows that Burlet admitted that he did not make any promises, pay any money, or provide any other consideration to Hammer, West, Northgold Trust, or NIT for the guarantees. (Alps SOF, ¶ 84; Burlet 56.1(b) Statement, ¶ 84). However, Burlet asserts that Hammer executed the guarantee in exchange for a promise that, if one of the bills of exchange was paid pursuant to the guarantee, Burlet and Hrynash would assist Hammer in obtaining financing for certain investment projects. (Burlet's Rule 56.1(a) Statement, ¶ 16; Hrynash).

---

[28] Burlet points to evidence showing that Nicholas Fernandes is a real person. This evidence, however, does not support the conclusion that the Fernandas Nicholas trust is a non-fictitious company. (Burlet's Response to Additional Facts Alleged in Alps Rule 56.1(b) Statement, B3; Burlet's reply memorandum in support of his cross-motion for summary judgment, Affidavits of Dr. Nicholas Fernandes & Mathias Burlet).
[29] The evidence cited by Alps does not support its allegations that: (1) the letter was also sent by West; and (2) the letter represented NIT's purported guarantee of Northgold USA's obligations.

According to Alps, the "to whom it may concern" document was not supported by any consideration. (Alps Rule 56.1(b) Statement, ¶ 11; Alps SOF, ¶¶ 81-85). On the other hand, Burlet claims that Hrynash made promises on Burlet's behalf. (Burlet 56.1(b) Statement, ¶ 84). But, Hrynash testified that he did not make any promises to Hammer on Burlet's behalf in connection with the guarantee. (Hrynash Dep., pg 183; Alps Rule 56.1(b) Statement, B4 & Exhibit 1, p. 183). The parties do agree, however, that Hrynash negotiated with Hammer for the guarantee and that Burlet did not directly speak to Hammer about the guarantee. (Burlet's Rule 56.1(a) Statement, ¶ 17; Burlet Dep., pp. 200-201; Alps Rule 56.1(b) Statement, ¶ 17 & B5).

Burlet claims that the guarantee was delivered to his home in Florida around November 8, 1998. (Burlet's Rule 56.1(a) Statement, ¶ 12; Burlet Aff., ¶ 5). Alps disputes that Burlet has an original of the Guarantee and that any Northgold company, any representative of those companies, or Hammer delivered the alleged guarantee to Burlet in Florida. (Alps Rule 56.1(b) Statement, ¶ 12; Alps SOF, Exhibit F and Burlet Dep., pp. 156-158).

Burlet also alleges that he received an undertaking that was executed by West from Hammer at his home in Florida. (Burlet's Rule 56.1(a) Statement, ¶ 18; Burlet Aff., ¶ 6).[30] In the undertaking, West named the ANB account and guaranteed the timely and complete payment on any negotiable instrument issued by or on behalf of Northgold International Trust and/or any

---

[30] Alps denies this allegation, but the testimony Alps cites to (Alps Rule 56.1(b) Statement, ¶ 18; Alps SOF, Exhibit F; Burlet Dep., pp. 156-158) does not match up with Burlet's facts. Specifically, the exhibit Alps cites to does not appear to be the same as the one cited by Burlet. Furthermore, it is unclear how Group Exhibit F supports Alps's denial. Moreover, here, as elsewhere, Alps failed to provide pinpoint cites to applicable sections of the record. Hence, Alps' denial is insufficient.

of the Northgold Group of Companies. (Burlet's Rule 56.1(a) Statement, ¶ 19; Burlet Aff., ¶ 6 and Exhibit D).[31]

### c. Burlet's Demands for Payment for the Bills of Exchange from Alps's ANB Account

Around November 9, 1999, after he learned about the existence of the NIT account at ANB, Burlet's attorney sent West a demand for payment of the bill of exchange. (Burlet's Rule 56.1(a) Statement, ¶ 20; Burlet Aff., ¶ 7 and Exhibit E).[32] Burlet claims that no payment pursuant to the bill of exchange and guarantee was made as a result of the demand. (Burlet's Rule 56.1(a) Statement, ¶ 21; Burlet Aff., ¶ 8). Alps admits that it is not aware of any payment made by West to Burlet. (Alps Rule 56.1(b) Statement, ¶ 21). Burlet further alleges that as of the date of Burlet's 56.1(a) Statement, Burlet did not receive payment pursuant to the bill of exchange and guarantee in whole or in part. (Burlet's Rule 56.1(a) Statement, ¶ 22; Burlet Aff., ¶ 8). Solely for purposes of this motion, Alps admits this allegation. (Alps Rule 56.1(b) Statement, ¶ 22).

In a letter dated November 10, 1999, Burlet's attorney told James Cygan ("Cygan") from ANB that Burlet had perfected a security interest on the NIT account at ANB. (Burlet's Rule 56.1(a) Statement, ¶ 23; Burlet Aff., ¶ 9 and Group Exhibit F).[33] However, according to Cygan, ANB's records did not reflect a security interest in favor of Burlet and he did not believe that

---

[31] Alps points to Group Exhibit F in Burlet's 56.1(a) Statement to deny Burlet's allegation. However, Alps failed to provide pinpoint cites to specific portions of the testimony to support its denial. The court declines to scour the record hunting for a needle in a haystack. Accordingly, the denial is insufficient.

[32] At least, the court thinks that this is what the record supports. Burlet's use of obviously incorrect exhibit letters in ¶¶ 23 and 24 does not help matters.

[33] Alps denies this allegation but its reference to Alps's Response to Burlet's Cross Motion for Summary Judgment, § C is not a proper denial under the local rules.

there was a security interest in favor of Burlet in connection with that account. (Alps Rule 56.1(b) Statement, B2).[34]

Burlet became aware of Alps' claim to the funds at ANB after serving the bank with perfecting documents. According to Burlet, perfecting documents are "such documents as are required to perfect [his] security interest in NIT Holdings Ltd. account at ANB . . . ." (Burlet's 56.1(a), Ex. A, par. 10 [sic]). It appears that these documents gave ANB notice of the guaranty, which Burlet spells "guarantee," purportedly issued by Northgold to Burlet on November 8, 1999. According to Hyrnash, Burlet's London associate, Perry Hammer indicated that the funds at ANB were his, and that he would give them to Hyrnash and Burlet. (Burlet's 56.1(a), Ex. C at 84).

Before this, Burlet was not aware of any potential adverse claims to the deposited funds. (Burlet's Rule 56.1(a) Statement, ¶ 24; Burlet Aff., ¶ 10; Alps Rule 56.1(b) Statement, ¶ 24).[35] Burlet filed suit with the Circuit Court of Cook County, Illinois. *Burlet v. Northgold (USA) Industries, Inc., et al*, No. 99 CH 16257. On February 16, 2001, based on failure to pay the amount due under the bill of exchange, guarantee, and undertaking, the court entered a default judgment in favor of Burlet and against Northgold USA and NIT Holdings, Ltd., in the amount

---

[34] Alps improperly included its 56.1(b)(3)(B) statement of additional facts with its Rule 56.1(b) Statement.

[35] The court notes that Alps flatly admits ¶24 of Burlet's Rule 56.1(a) statement. However, it appears from ¶ 27 of Alps's Rule 56.1(b) statement that Alps intended to deny the allegation because it refers to an argument in one of its briefs in support of a denial of a later paragraph, which really amounts to an intended denial of the fact that Burlet perfected his security interest in the ANB funds. Besides being totally confusing, this is an improper denial. Local Rule 56.1(b)(3)(A) requires that Alps must include "specific references to the affidavits, parts of the record, and other supporting materials relied upon..." in making its denial; it cannot make a legal argument as "support" for its denial. Therefore, paragraph 24 is deemed admitted.

of $10 million. (Burlet's Rule 56.1(a) Statement, ¶ 25; Burlet Aff., ¶ 11 and Exhibit G; Alps Rule 56.1(b) Statement, ¶ 25).

Alps was not a party to the state court case. (Burlet's Rule 56.1(a) Statement, ¶ 26; Burlet Aff., ¶ 11; Alps Rule 56.1(b) Statement, ¶ 26). In return for Alps withdrawing its motion to stay this proceeding, Burlet has stipulated that any judgment rendered by the state court would not foreclose Alps from arguing that Burlet does not have a legitimate claim against NIT with regard to the funds at issue in the instant case. (Alps Rule 56.1(b) Statement, B6 & Exhibit 4).

## II.  Discussion

This case boils down to one fundamental question: who gets the $12,000,000 from the ANB account? Alps claims that it gets the $12,000,000 because: (1) it is entitled to a constructive trust covering the money as a result a fraud perpetrated against it by either Yamada or NIT and West; and (2) Burlet's claim to the funds is invalid because the guarantee issued to him by NIT on November 8, 1999, was invalid.

In response and in support of his cross-motion for summary judgment, Burlet contends that: (1) Alps is not entitled to a constructive trust because there was no fraud; (2) Burlet's guarantee is valid, enforceable, and superior to Alps' claim to the funds; and (3) where two innocent parties must suffer, the loss must fall on the one whose agent caused the loss or made the loss possible, so Burlet's claim trumps Alps' claim.

It will come as no surprise to anyone who has perused the above fact section that numerous material issues of disputed fact preclude the entry of summary judgment as to these issues. The court will nevertheless briefly outline the reasons why the cross-motions for summary judgment must be denied.

## A.    Standard on a Motion for Summary Judgment

Summary judgment is proper when the "pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party opposing the summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading"; rather, it must respond with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Valenti v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir. 1992).

## B.    Constructive Trust Predicated on Fraud

Alps claims that it is entitled to a constructive trust regarding the $12,000,000 at issue. Under Illinois law, which governs this dispute, a constructive trust may generally be imposed where one of the following occurs: (1) fraud, (2) breach of fiduciary duty, or (3) duress, coercion or mistake. *Amendola v. Bayer*, 907 F.2d 760, 762-63 (7th Cir. 1990), *quoting Suttles v. Vogel*, 533 N.E.2d 901, 904-05 (Ill. 1988). The grounds for imposing a constructive trust must be "so clear, convincing, strong and unequivocal as to lead to but one conclusion." *Id.*

Alps claims that it is entitled to a constructive trust because it was the victim of fraud. Specifically, it claims that: (1) the funds were obtained due to the fraud perpetrated by Yamada; or (2) the funds were obtained due to fraud perpetrated by NIT and West. Accordingly, to prevail on its constructive trust claim, Alps must first establish that there is no genuine issue of material fact as to at least one of its fraud claims, and that it would prevail on that claim as a matter of law.

In order to prevail on a fraud claim in Illinois, a claimant must show: (1) a false statement of material fact; (2) by one who knows or believes it to be false; (3) made with the intent to induce action by another in reliance on the statement; (4) action by the other in reliance on the truthfulness of the statement; and (5) injury to the other resulting from that reliance. *TRW Title Ins. Co. v. Security Union Title Ins. Co.*, 153 F.3d 822, 828 (7th Cir. 1998); *Athey Prods. Corp. v. Harris Bank Roselle*, 89 F.3d 430, 434 (7th Cir. 1996).

In addition, the reliance on the misrepresentation must have been reasonable. *Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc.*, 250 F.3d 570, 573 (7th Cir. 2001). Moreover, the party alleging the fraud bears the burden of proving intent to defraud by clear and convincing evidence. *Athey Prods.*, 89 F.3d at 434. Here, because elements of both of Alps' predicate fraud claims are disputed, summary judgment as to its constructive trust claim must be denied.

### 1.    Fraud by Yamada

Alps first contends that Yamada forged Aihara's signature in order to authorize the transfer of the $12,000,000 from Anglo-Irish Bank to ANB, and neither Aihara nor anyone else at Alps approved the transaction. In support of the contention that Yamada lacked authority to effect the transaction in this manner, Alps refers to Yamada's claim, in his affidavit, that he was not an employee of Alps. (Alps 56.1(a), Ex. A) Without citing a single case or even sketching out how this allegedly undisputed fact satisfies each of the elements of fraud, Alps simply concludes that it is "undisputed that the funds in the ANB account were obtained by the fraud of Mr. Yamada." (Alps I at 13) Because of this "actual fraud," Alps concludes that it is entitled to a constructive trust on the $12,000,000. (Alps I at 13)

Unsurprisingly, Burlet disagrees that Yamada lacked authority, noting that: (1) Yamada had authority to sign Aihara's name and effect the transfer because Alps' Board of Directors

-33-

gave him authority as a "Director", and (2) alternatively, even if Yamada did not have authority

when he signed Aihara's name and effected the transfer, Alps subsequently ratified Yamada's

actions. The court will address each of these arguments in turn.

### a.     Yamada's authority

So, did Yamada have authority to effect the transfer? Burlet says "yes," pointing to the

resolution by Alps' board of directors calling Yamada a "Director" and Alps' "Corporate

Registration," which states that Aihara, Ichiyama, and Yamada are all directors of Alps. (Burlet

56.1(b), Ex. 24, at 2; Burlet 56.1(b), Ex. 3). However, Alps denies that Yamada was an Alps'

employee and disputes whether the Corporate Registration is indeed what it purports to be.

(Alps Response 56.1(b)(3)(B), ¶ B27).

A jury, not the court, must decide whose version of events is correct. *Ritchie v. Glidden

Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (the weighing of evidence is for the trier of fact, so the

court may not "conduct a paper trial on the merits of [a] claim"). Because the parties dispute

whether Yamada had authority to sign Aihara's name in order to authorize the transfer of funds

from Anglo-Irish Bank to ANB, Alps' first fraud claim cannot support the imposition of a

constructive trust in its favor as to the $12,000,000.

### b.     Ratification

This brings the court to Burlet's alternative ratification argument. Ratification may be

express or implied. *Evanston Bank v. Conticommodity Servs., Inc.*, 623 F. Supp. 1014, 1034

(N.D. Ill. 1985). "[Implied] ratification occurs when the principal, with full knowledge of all

material facts of an unauthorized transaction, conducts himself in a manner inconsistent with the

repudiation of the agent's unauthorized transaction, or retains the benefits of the unauthorized

transaction." *Old Security Life Ins. Co. v. Continental Ill. Nat'l Bank & Trust Co.*, 740 F.2d

1384, 1392 (7th Cir.1984); *see also Evanston Bank,* 623 F. Supp. at 1034. However, this theory of ratification is only available to an innocent party who has relied upon the validity of the transaction to his detriment. *Evanston Bank,* 623 F. Supp. at 1034, 1037.

Burlet contends – without citing any authority – that even if Yamada lacked authority to sign Aihara's name in order to transfer funds to ANB so Alps could participate in the NIT investment program, Alps subsequently ratified Yamada's actions. Burlet's ratification argument appears to be based on the fact that the resolution giving Yamada authority to act was sent to Aihara, the victim of the alleged forgery, long after the funds were transferred from Anglo-Irish Bank to ANB. (Burlet I at 9).

In response, Alps argues that Burlet has failed to state the elements of a claim for ratification because he failed to establish that Aihara knew about Yamada's forgery and the transfer or that Alps acted inconsistently with the repudiation of the transaction. According to Alps, Aihara knew that a fiduciary account in the amount of $12,000,000 had been opened in order to participate in the investment program, but did not know that funds had been transferred from Alps' Anglo-Irish Bank account to ANB.

As noted above, the first element of implied ratification requires the principal to have full knowledge of all material facts relating to the unauthorized transaction. *Old Security Life Ins.,* 740 F.2d at 1384. To satisfy this test, Aihara would have had to have known that Yamada signed his name to effect the transfer of funds from Anglo-Irish Bank to ANB for use in the trading program.

Like so many of the material facts in this case, however, whether Aihara or anyone at Alps knew what Yamada was up to is in dispute. Yamada and Aihara's affidavits support Alps' position, while Burlet contends that the only inference to be drawn from the evidence is that

Alps knew about the transfer and approved it. Because the court's job is not to weigh the evidence, but to determine whether a factual dispute exists, summary judgment as to this claim must be denied. *See Ritchie v. Glidden Co.*, 242 F.3d at 723. Accordingly, the ratification claim cannot support Alps' request for the imposition of a constructive trust.

### 2. Fraud by NIT and West

The court next considers Alps' claim that NIT and West obtained the funds in question by means of fraud. According to Alps, West, Hammer, and Northgold Trust made four knowingly false statements to Alps.[36] (Alps I at 14) First, West, Hammer and Northgold told Alps that Northgold Trust was engaged in a "special" bond trading program, when in fact no such program existed. Second, West told Yamada that he would hold Alps' $12,000,000 as a fiduciary but then West and Hammer withdrew nearly $2,000,000 and distributed the funds to themselves, their creditors, and their business associates. Third, West and Hammer represented that they had executed a trade with a $308,000 profit, when in fact the "profit" was simply Alps own $308,000 transferred back to it. Fourth, West lied to the employees of Bank One regarding an alleged purchase of bonds from SDL, an entity which did not exist. Alps asserts that, based on these representations, it entered into the Joint Venture Agreement with Northgold Trust, and that Yamada transferred funds from Anglo-Irish Bank to the ANB account. This resulted in the improper removal of $12,000,000 from Alps' Anglo-Irish Bank account.

Burlet counters with three arguments: (1) the legitimacy of the NIT trading program is a disputed issue of material fact; (2) there is no evidence that Alps took any steps reasonably

---

[36] Alps initially states that "NIT and West" obtained the funds by means of fraud. Alps Memorandum at 14. In the very next sentence of its brief, Alps states that "West, Hammer, and Northgold Trust" made the false statements. *Id.* Because Alps does not distinguish between the various corporate alter egos of the so-called Northgold group of companies, the court will likewise lump them together.

necessary to ascertain whether the NIT trading program was legitimate; and (3) even if West and Hammer's representations were false, Alps suffered no damages as a result of the alleged fraud.

### a.    Legitimacy of the trading program

In support of Burlet's claim that there are questions of fact regarding the legitimacy of the NIT program, Burlet points to Jasbir Mudhar's affidavit. (Burlet 56.1(b), Ex. 35) Mudhar asserts that investments of the type offered by NIT exist. (Burlet 56.1(b), Ex. 35 at 2) However, this assertion fails to definitively establish that NIT's program was legitimate.

Burlet also argues that Alps' evidence fails to establish that the NIT program was illegitimate. According to Burlet, all that Alps' evidence shows is that West was unable to obtain financing for the investment program in Europe, and that his efforts to effectuate trades were thwarted by bank officers who froze the ANB account shortly after it was created.

Once again, the court may not choose sides, make credibility determinations, or weigh the evidence in connection with a motion for summary judgment. Therefore, there is a genuine issue of fact as to whether the NIT program was legitimate. This means that Alps' claim that it was defrauded by West, Hammer, or any of the NIT/Northgold group of companies cannot support the imposition of a constructive trust.

### b.    Justifiable reliance

Burlet next asserts that West and NIT cannot be liable for fraud because there is no evidence that Alps took any steps reasonably necessary to ascertain whether the NIT trading program was legitimate. His theory is that Alps' failure to conduct a reasonable investigation regarding the trading program before investing means that it could not have justifiably relied on the representations of Northgold representatives. (Burlet I at 10).

Reliance is normally a question of fact. *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001). It can be determined as a matter of law only when no trier of fact could find it was reasonable to rely on the alleged statements, or when only one conclusion can be drawn from the evidence. *Id.* To determine whether reliance was justified, the court must consider all of the facts that the plaintiff knew, as well as those facts that the plaintiff could have learned through the exercise of ordinary prudence. *Id.* Although the alleged victim may not ignore a manifest danger, he is "not obliged to dig beneath apparently adequate assurances." *AMPAT/Midwest, Inc. v. Ill. Tool Works, Inc.*, 896 F.2d 1035, 1042 (7th Cir. 1990). However, Illinois law requires a plaintiff to investigate when, given the totality of the circumstances, prudence so requires. *Teamsters Local 282 Pension Trust v. Angelos*, 839 F.2d 366, 371 (7th Cir. 1988).

In the present case, the parties disagree as to whether Alps or Seto (who may well be the source of the $12,000,000 Alps invested in the program) conducted appropriate "due diligence" investigations regarding the trading program. Burlet claims that there is no evidence of any such investigation, relying upon an affidavit from Yamada to this effect, while Alps claims that Yamada did in fact try to learn about the investment program. Moreover, the parties do not provide the court with any evidence as to what would constitute "due diligence" or a reasonable investigation under the circumstances presented by this case. Because the court cannot make a determination as to what would constitute ordinary prudence here, and it is unclear exactly what investigation occurred, a material issue of disputed fact precludes the entry of summary judgment.

### c. Damages: Who is the Real Party in Interest?

Finally, Burlet contends that even if there was fraud, Alps suffered no damages because it was not the real party in interest. Burlet claims that Alps' directors invested money belonging to Seto and that Seto bore the entire risk of the investment because Seto's money ultimately ended up in the ANB account used for the investment program. In contrast, Alps denies that Seto bore the entire risk of the investment, claiming that one of its subsidiaries loaned Seto the money in question. (Alps 56.1(b), ¶ 33). Once again, the contradictory evidence as to a material issue means that summary judgment is improper as to this issue.

### C. Validity of Burlet's Guaranty

The second fundamental issue in this case concerns the validity of a guarantee issued by Northgold to Burlet on November 8, 1999. Alps contends that this guarantee is not binding because it was not valid or enforceable. Alternatively, it contends that, even if the guarantee was facially binding, it is unenforceable because: (1) it is a fraudulent conveyance; (2) it is based on fraudulent bills of exchange; and (4) Burlet does not have a security interest in the interpleaded funds. In contrast, Burlet argues that the guarantee was valid and enforceable, and as such, gives him a security interest in the interpleaded funds.

### 1. Validity and Enforceability of the Guaranty

Under Illinois law, guaranties are contracts, which are interpreted in accordance with their clear and unambiguous meaning. *Chrysler Credit Corp. v. Marino*, 63 F.3d 574, 577 (7th Cir. 1995). Moreover, guaranties are invalid unless they are supported by sufficient consideration. *Am. Nat'l Bank of Champaign v. Warner*, 127 Ill. App. 3d 203, 468 N.E.2d 184, 187 (4th Dist. 1984), *citing Toffenetti v. Mellor*, 153 N.E. 744 (Ill. 1926). Ordinarily, the consideration given in the principal transaction is sufficient for the guaranty if the guaranty is

executed contemporaneously with the principal transaction. *Carl v. Galuska*, 785 F. Supp. 1283, 1289 n.2 (N.D. Ill. 1992). However, a guarantee executed after the underlying contract is formed must be supported by additional consideration. *Id.*

Here, Alps asserts that Burlet's November 8, 1999, guaranty lacks consideration. Specifically, it contends that the Northgold USA bills of exchange (the principal transaction) were executed and delivered to Burlet on November 12, 1998. The guaranty, however, was not signed until November 8, 1999. Thus, Alps concludes that the guaranty needed to be supported by additional consideration to be valid.

Burlet concedes that the guaranty was not executed contemporaneously with the principal transaction. He nevertheless contends that the November 8, 1999 guaranty was supported by consideration. After holding the Northgold bills of exchange for several months, Burlet became aware that Northgold had enough money to repay one bill at ANB in Chicago. Jerry Hrynash, Burlet's London associate, met with Perry Hammer of Northgold, and the two agreed that Northgold would provide Burlet with a guaranty of negotiable instruments issued by any of the Northgold group of companies, including the bills of exchange in question. As consideration for the guaranty, Burlet claims that he agreed to assist Hammer's companies in attempting to obtain financing for future projects. As a result, West, the Northgold group's attorney, wrote to Burlet, stating that the guaranty would be paid from funds in the ANB account.

To support this assertion, Burlet has attached a copy of the alleged guaranty and West's letter to his Local Rule 56.1(a) statement. (Burlet 56.1(a), Exs. C, D). With respect to consideration, Burlet attaches excerpts from Hrynash's deposition to the effect that, in exchange for the guaranty, either Hrynash or Burlet would assist Hammer to obtain funds for various undertakings. (Burlet 56.1(a), ¶ 16, Ex. C pp. 84-89).

-40-

In response, Alps maintains – without the benefit of any authority or specifics – that Burlet made no promise, paid no money, and provided no consideration to Hammer for the guaranty. However, it does point to the fact that, when Burlet was asked at his deposition if he gave any consideration in exchange for the guaranty, he responded, "No, nothing, nothing." (Alps 56.1(a), ¶ 84, Ex. E (Burlet Dep.), p. 159)

Hrynash and Burlet's deposition testimony regarding the presence, or lack thereof, of consideration is obviously contradictory. Where evidence is contradictory, a genuine issue of material fact exists. *See Ritchie v. Glidden Co.*, 242 F.3d at 723. Thus, the court cannot assess the validity of Burlet's claim to the interpleaded funds on summary judgment.

In an effort to streamline further proceedings, the court will nevertheless address whether the promise to assist Hammer in obtaining financing constitutes sufficient consideration, even though there is a genuine issue of material fact as to whether this promise was actually given. Although an illusory promise is not sufficient consideration, a promise to assist in a contemplated venture is not illusory. *See Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1206-07 (7th Cir. 1998).

In *Regensburger*, China Adoption Consultants ("CAC") promised to assist the Regensburgers while in China in adopting a child. *Id.* at 1203-04. The parties entered into an agreement to this effect. *Id.* at 1204. The Regensburgers went to China and adopted what they thought was a three-year-old child; however, when they discovered that she was in fact six, they sued CAC for breach of contract. *Id.* The Regensburgers argued that the promise to provide services was illusory. *Id.* at 1206.

The Seventh Circuit disagreed, explaining that a promise is illusory where it looks like a promise but, upon closer examination, it is clear that the promisor did not promise to do

-41-

anything. *Id.* Although the promise to assist the Regensburgers in China could not have been completed before the contract was signed, the court found that the promise was real because CAC had in fact promised to do something. *Id.* at 1207. Here, Burlet promised to assist Northgold in obtaining financing for contemplated ventures. This is a promise to do a specific action and thus, like the promise in *Regensburger*, constitutes sufficient consideration to support a contract.

### 2.    Fraudulent Conveyance

Under Illinois law, a conveyance is fraudulent where: (1) a creditor's claim arose before the transfer, (2) the transfer was made without receiving reasonably equivalent value in exchange for the transferred property, and (3) the transferor either was insolvent at the time of the transfer or became insolvent as a result of the transfer. 740 ILCS § 160/6; *In re Mussa*, 215 B.R. 158, 168 (Bankr. N.D. Ill. 1997); *Falcon v. Thomas*, 258 Ill. App. 3d 900, 909, 629 N.E.2d 789, 795 (4th Dist. 1994). Proof of actual fraudulent intent or actual insolvency is not necessary to establish a fraudulent conveyance. *Falcon*, 258 Ill. App. 3d at 909, 629 N.E.2d at 795. Instead, the test is whether the conveyance impaired the rights of creditors. 258 Ill. App. 3d at 910, 629 N.E.2d at 796.

Alps asserts that the guaranty issued by Northgold on November 8, 1999, to Burlet was a fraudulent conveyance. This argument is perplexing because a guaranty, in and of itself, does not convey anything. In order for a fraudulent transfer to exist, some sort of interest must be transferred. *See Regan v. Ivanelli*, 246 Ill. App. 3d 798, 803, 617 N.E.2d 808, 814 (2d Dist. 1993) (where transferees were the original owners of the transferred interest, no fraudulent transfer occurred because a fraudulent transfer necessarily requires the transfer of something of value). Here, Northgold did not transfer money to Burlet and thus did not convey an interest.

Thus, it appears that the guarantee cannot constitute a fraudulent conveyance. The court would be more definitive, but the lack of clarity in the parties' submissions and the general lack of authority makes it difficult to definitively ascertain the parties' precise arguments.

Even if the guaranty could be considered a conveyance of some sort of interest, and that interest was great enough to impair the rights of Northgold's creditors, whether or not Burlet gave consideration of reasonably equivalent value in exchange for the guaranty is disputed. Generally, whether consideration is of reasonably equivalent value is a question of fact. *In re Crystal Med. Prods., Inc.*, 240 B.R. 290, 300 (Bankr. N.D. Ill. 1999). Here, Alps claims that Burlet gave no consideration for the purported guaranty, citing to Burlet's own deposition testimony to that effect. (Alps 56.1(a), ¶ 84, Ex. E (Burlet Dep.), p. 159) In contrast, Burlet claims that he exchanged a promise to assist Hammer and Northgold obtain financing for contemplated ventures for the guaranty, and cites deposition testimony of his London associate, Jerry Hrynash. (Burlet 56.1(a), ¶ 16, Ex. C pp. 84-89).

The court cannot choose between conflicting evidence at the summary judgment stage. *See Ritchie v. Glidden Co.*, 242 F.3d at 723. Thus, as with so many other issues in this case, there is a genuine issue of fact as to whether consideration was given for the guaranty. Accordingly, Alps' contention that Northgold and Burlet effected a fraudulent conveyance cannot, on summary judgment, invalidate Burlet's claim to the interpleaded funds.

3.    **Bills of Exchange & Fraud**

Alps next argues that the bills of exchange that supported the Northgold bills of exchange (upon which the guaranty discussed above was issued) were worthless. It thus concludes that, because no consideration supported the original transaction, the guaranty was also worthless. The so-called "original transaction" appears to be related to the bills of exchange from Berenger,

the man whose first name is unknown, who bought the emeralds. In exchange for the emeralds, Berenger gave Burlet the original bills of exchange.

Burlet then made a deal with Bliznakov, the Ukranian business man who agreed to collect the bills and share profits. Bliznakov entered into a finance agreement with Northgold, and Northgold gave Bliznakov new and different bills of exchange. These bills of exchange also belonged to Burlet because Bliznakov obtained them for the Burlet-Bliznakov joint venture. Burlet wanted to collect the Northgold bills of exchange. He found out that Northgold had money at ANB, so he contacted Hammer to seek payment of the bills of exchange. Hammer then allegedly issued the guaranty, indicating the ANB funds belonged to Northgold and that he would pay Burlet from these funds.

Regarding these transactions, Alps claims that the original bills of exchange issued to Burlet by Berenger for the emeralds were worthless because Berenger was going to jail. Because the original bills of exchange were allegedly worthless, Alps claims that they could not constitute consideration. Alps also contends that, because Burlet knew that the original bills of exchange were worthless, he cannot be a holder in due course under Illinois' version of the UCC, so the transaction is subject to rescission under the UCC based on fraud.

Before the court can reach the merits of this exceedingly convoluted argument, it must ascertain what law governs the transactions. The record is not clear as to where the bill of exchange transactions occurred, but it is clear that they did not occur in Illinois. Furthermore, none of the parties to these transactions were citizens of Illinois. Therefore, it would be improper to apply Illinois law to these transactions, at least based on the information that presently exists in the record. *See Kafka v. Bellevue Corp.*, 999 F.2d 1117, 1121-22 (7th Cir. 1993) (applying Illinois choice of law principles to guaranty transactions, and holding that

Illinois was not the state with the most significant relationship to the transaction as investment property was located in California, defendants were California citizens, and investments and guarantees were made in California; therefore, California, not Illinois law, applied to the transactions).

Because the record does not contain enough information to allow the court to determine what law applies, it cannot address Alps' claim for rescission based on fraud. And, in any event, even if the court knew what law applied to these transactions, summary judgment would still be improper because many of the facts underlying these transactions are disputed.

### 4. Does Burlet Have a Security Interest in the Funds?

Alps also claims that Burlet is not entitled to the interpleaded funds because he does not have a security interest in them. Under Illinois law, a security interest exists only when: (1) the parties have entered into an agreement, (2) value has been given, and (3) the debtor has rights in the collateral. 810 ILCS § 5/9-203;[37] *Bulger v. Thorp Credit Inc. of Ill.*, 609 F.2d 1255, 1257 (7th Cir. 1979). For the sake of expedience, the court will focus on the second element, which requires the creditor to give consideration to the debtor in exchange for rights in the collateral. *See Metropolitan Life Ins. Co. v. Am. Nat'l Bank & Trust Co.*, 288 Ill. App. 3d 760, 766, 682 N.E.2d 72, 76 (1st Dist. 1997).

---

[37] In its brief, Burlet cites 810 ILCS § 5/9-302, instead of § 5/9-203. Section 5/9-302 governs perfection and priority of agricultural liens. Alps points out that Burlet has mistakenly cited the wrong *sub*section of the statute in its brief, but doesn't catch the mistake of citing 302 for 203 because Alps cites intermittently to both 203 and 302. Unfortunately, this is a typical example of the level of care the parties have exercised in drafting their briefs. While the court has diligently attempted to piece together the parties' arguments and the applicable law in connection with the current motions, it will not be as patient in the future. All of the parties are on notice that further pleadings on a par with the ones currently before the court will be stricken.

In this case, the "value given" element means that Burlet, the creditor, must have given consideration to Northgold in exchange for the guaranty on the funds at ANB. As the court has already discussed, the parties dispute whether Burlet gave consideration for this guaranty. Because this element is disputed, the court cannot determine whether Burlet had a security interest.

### D.    Loss & Two "Innocent Parties"

Finally, Burlet claims that he gets the money because, "[w]here one of two innocent parties must suffer [sic] the loss must fall on the one who makes the loss possible or whose agent occasioned the loss." *Brenner v. Franke*, 18 Ill. App. 2d 202, 209, 151 N.E.2d 650, 653 (4th Dist. 1958). Burlet appears to be making an equitable argument that he should get the money and Alps should bear the loss because Alps caused this dispute by giving the funds to NIT. As discussed above, however, the facts in this case are so disputed that the court cannot make any determinations as to the equities and their impact on who should bear the loss.

## III.    Conclusion

For the above reasons, the court concludes that a trial is necessary in the present case. The parties' cross-motions for summary judgment [50-1 and 54-1] are DENIED.

DATE: 3-29-02

Blanche M. Manning
United States District Judge

99cv6990.sj